[Cite as *In re J.T.*, 2011-Ohio-3324.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN THE MATTER OF: | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| J.T., | Hon. William B. Hoffman, J.<br>Hon. Julie A. Edwards, J. |
| DELINQUENT CHILD | |
| | Case No. 10-CA-134 |
| | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Licking County Court of
                             Common Pleas, Juvenile Division, Case
                             No. A2010-0313

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      June 30, 2011

APPEARANCES:

For Appellee                 For Appellant


KENNETH W. OSWALT            TODD W. BARSTOW
Licking County Prosecutor    4185 East Main Street
                             Columbus, Ohio 43213
BY: RACHEL OKTAVEC
Assistant Prosecuting Attorney
20 S. Second Street, Fourth Floor
Newark, Ohio 43055


                             Guardian Ad Litem

                             THOMAS GORDON
                             8026 Woodstream Dr., N.W.
                             Canal Winchester, Ohio 43110

*Hoffman, J.*

{¶1}   Appellant J.T., a minor child, appeals his adjudication in the Licking County Court of Common Pleas, Juvenile Division.   Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   While seventeen years-old and a student at Licking Heights High School, Appellant was arrested for incidents involving several classmates at school.[1]

{¶3}   On April 28, 2010, the State filed a complaint in the Licking County Court of Common Pleas, Juvenile Division, charging Appellant with six counts of sexual imposition, two counts of menacing and one count of voyeurism.  The matter proceeded to a bench trial on July 12, 2010.  The State dismissed all the counts except for two counts of sexual imposition.  Via Judgment Entry of July 12, 2010, the trial court adjudicated Appellant delinquent of one count of sexual imposition, and one count of disorderly conduct, a lesser included offense.  On October 25, 2010, the trial court conducted a dispositional hearing. Via Judgment Entry of the same date, the trial court classified Appellant a Tier I sexual offender.

{¶4}   Appellant now appeals, assigning as error:

{¶5}   "I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF SEXUAL IMPOSITION AS THAT

---

[1] Additional facts will be included in our analysis of Appellant's first assignment of error.

VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} "II. THE APPLICATION OF S.B. 10 VIOLATES THE UNITED STATES CONSTITUTION'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS. EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

I.

{¶7} An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence most favorably to the state, the jury could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 273. "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins,* 78 Ohio St.3d 380, 390, 1997–Ohio–52 (Cook, J., concurring).

{¶8} In contrast, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee* (Dec. 23, 1994), 11th Dist. No. 93–L–082. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175. An appellate court must defer to the factual

findings of the jury regarding the weight to be given to the evidence and credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.

{¶9} Appellant was adjudicated delinquent of sexual imposition, in violation of Ohio Revised Code Section 2907.06(A)(1):

{¶10} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

{¶11} "(1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard."

{¶12} Revised Code Section 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶13} At the July 12, 2010 adjudicatory hearing P.W., an alleged victim in this matter, testified:

{¶14} "Q. Okay. And you started not being friends, correct?

{¶15} "A. Right. We would get into - -

{¶16} "Q. And why is that?

{¶17} "A. We would get into arguments very often and he would harass me all the time. He would call me names, and he would violate my privacy, and I would always tell him to stop but he wouldn't listen.

{¶18} "Q. And how would he violate your privacy?

**{¶19}** "A. He would, like, graze my legs, and try and give me shoulder massages, trying to move up to my chest, and he would - - then I'd tell him no and then he'd get mad.  And then, when he would get mad, he would call me names and start making fun of me and then causing us to get into another argument.

**{¶20}** "Q. And did he - - when you said he tried to touch your breasts, did he touch your breasts?

**{¶21}** "A. Yes.

**{¶22}** "Q. How did he do that?

**{¶23}** "A. He came from over top.

**{¶24}** "Q. What do you mean, like - -

**{¶25}** "A. Like he would move from my shoulders and then move down.  He would graze and then I would tell him to stop.

**{¶26}** "Q. And he'd touch your breasts - -

**{¶27}** "A. Yes.

**{¶28}** "Q. - - actually?  And when was that?

**{¶29}** "A. I remember the one incident - - it happened over multiple times, but the one incident I can actually put a date on was right after winter break, because we were in study hall and my boyfriend had just left the classroom and we started dating then, so, that's how I remember the exact date.

**{¶30}** "Q. Oh, okay.

**{¶31}** "A. So it was right after winter break?

**{¶32}** "Q. Right after winter break?  And did you report it then?

{¶33} "A. No, I just - - I pretty much ignored it because I would tell him to stop, and then he'd stop for a while, and then he'd keep - - he would – he was consistent - -

{¶34} "Q. How - -

{¶35} "A. - - about trying.

{¶36} "Q. And how often did he touch your breasts?

{¶37} "A. About - - he would try about once a week, but he wouldn't - - I wouldn't let him do it very often, because I would tell him to stop. I would yell at him then we'd get into another argument.

{¶38} "Q. Okay. And - - but he succeeded once and that was over your shirt - -

{¶39} "A. Yeah.

{¶40} "Q. - - not under?

{¶41} "A. Huh-uh.

{¶42} "Q. Okay. And did he know that this was offensive to you? What did you tell him about that?

{¶43} "A. I made it clear. I made it very clear that I did not want him touching me at all.

{¶44} "Q. And how did you do that?

{¶45} "A. I would scream at him and tell him to stop."

{¶46} Tr. at 15-18.

{¶47} Another student at Licking Heights High School, C.B., testified to witnessing the incidents:

{¶48} "Q. Did you - - what did you – did you see [J.T.] do anything to [P.N.]?

{¶49} "A. I saw her - - saw him grope her.

**{¶50}** "Q. What do you mean 'grope her'?

**{¶51}** "A. Touch her breasts and her bottom.

**{¶52}** "Q. And when did you see that?

**{¶53}** "A. English and algebra.

**{¶54}** "Q. So, it would happen more than once?

**{¶55}** "A. Yes.

**{¶56}** "Q. Do you know when it happened?

**{¶57}** "A. Not the exact date, no.

**{¶58}** "Q. Did it happen this school year?

**{¶59}** "A. Yes.

**{¶60}** "* * *

**{¶61}** "Q. And, so, he touched her breasts a few times?

**{¶62}** "A. Yes.

**{¶63}** "Q. Was this over or under the clothes?

**{¶64}** "A. Over.

**{¶65}** "Q. And were [P.N.] and [J.T.] ever dating?

**{¶66}** "A. No."

**{¶67}** Tr. at 36-38.

**{¶68}** Another student, S.H., testified:

**{¶69}** "A. Yeah, like he would come up and, like, hug me and I'd tell him to, like, let go because, like, he wouldn't let go.  And he'd just keep going and finally he'd, you know, stop and then he'd, like, give me a look like what the heck?

**{¶70}** "And like we went on this school field trip and I came back - - and we had to dress nice, so, I had a skirt on about to my knees.  And he was, you know, trying to look up my skirt and stuff.  And I was like - - you know, and he was like calling me, like, sexy and stuff.  And like, I don't know, just to me it was like - - made me uncomfortable around him because, I don't know, it's just - - I don't think anybody should be doing that, especially if you don't know somebody that well because I don't - - like I had a class with him but I didn't know him as a person that well.

**{¶71}** "Q. And how is he trying to look up your skirt?

**{¶72}** "A. He was sitting at his desk and he - - and I walked by and he was like, you know, going like that.  I was just like, you know, what are you doing?

**{¶73}** "Q. And, when he hugged you, did - - where were his hands?

**{¶74}** "A. Like he would wrap around me, like, squeeze me really tight.  So it was like - - you know, like - - -almost like I couldn't move.  And I would be like, you know, like stop, okay - - or, okay, that's enough kind of thing and he just wouldn't stop.

**{¶75}** "Q. Okay.  Did he touch you in any inappropriate places?

**{¶76}** "A. One time he touched my butt and he, like, grazed my chest, but I don't know if the chest thing was on purpose or an accident.

**{¶77}** "Q. Okay.  And what did you tell him when he was trying to look up your skirt?

**{¶78}** "A. To stop.

**{¶79}** "Q. Did he know that it was bothering you?

**{¶80}** "A. I don't know, but I thought he would get the idea when I gave him that look like stop doing that and stuff, but he didn't I guess.

**{¶81}** "Q. And you're not married to [J.T.], right?

**{¶82}** "A. No.

**{¶83}** "Q. I know that's a ridiculous question.  What were the kind of things that [J.T.] was saying to you when he was talking to you?

**{¶84}** "A. Well, if I wouldn't talk to him or something like that, he would call me - -

**{¶85}** "Q. It's okay.

**{¶86}** "A. - - a bitch.  And, you know, I'd just be like, okay, cause I didn't do anything; or he'd just mess around and call me that because of something.  And then he'd be like, well, I'm just kidding.  But you shouldn't mess around with something like that, because somebody could really think you're mad at them.

**{¶87}** "* * *

**{¶88}** "Q. How many times are you alleging that [J.T.] touched you inappropriately?

**{¶89}** "A. He only touched me inappropriately twice.  But like the action, like the hugging and stuff, got a - - that was a little uncomfortable, and the names he called me, and looking up my skirt.

**{¶90}**   Tr. at 54-57; 66-67.

**{¶91}**   Another student A.L. testified,

**{¶92}**   "Q. How did he touch you?

**{¶93}**   "A. Just kind of like . . .

**{¶94}**   "Q. It's okay.  I know this is hard but you'll have to explain it to everyone so that they can hear you.

**{¶95}** "A. Like he would do like a back massage thing and his hands would go down like - - or try to go down my shirt, I guess.

**{¶96}** "Q. Okay.  If you can kind of describe that - - how that was working.

**{¶97}** "A. Like he would be behind me and I'd be in front, I guess.  Like I'd be - - just be sitting in a chair.  And I guess he would come up to me and he would do that, sort of act like he had - - his hands would be on my shoulders and then they would, like, start going down.  And, you know, at that point I would tell him to stop.

**{¶98}** "Q. Okay.  And, so, during the massage his hands didn't stay on your shoulder - - shoulders?

**{¶99}** "A. No.  No.

**{¶100}** "Q. Okay.  And where did they end up?

**{¶101}** "A. About like right here, but I would stop him because they - - yeah.

**{¶102}** "* * *

**{¶103}** "Q. What other physical contact did you have with him during the year?

**{¶104}** "A. Like he would sort of kind of, like, touch them like straight on, I guess.

**{¶105}** "Q. Okay.  What do you mean 'sort of, kind of, and then them'?

**{¶106}** "A. My breasts as 'them'.

**{¶107}** "Q. Okay.

**{¶108}** "A. Like - - just kind of - - not really straight on, more so like a bump, but that's where his hands would end up.

**{¶109}** "Q. Okay.  Can you describe the situation that that happened in?

**{¶110}** "A. In the hallway walking from class to class or maybe on the bus.

**{¶111}** "Q. And what do you mean his hands ended up there?

{¶112} "A. Like he would bump into me and his hands would, like, go out and grab them.

{¶113} "* * *

{¶114} "Q. Okay. And on the bus how did that happen? And if you can show us - -

{¶115} "A. It was the same sort of back massage thing he was - - like he would be behind me. * * *

{¶116} "A. He would be behind me and it would kind of go - - it would start like that and I'm kind of like, you know, trying to get him off my shoulders by moving my shoulders. And then it would go, like, about this far and then I'd just take his hands and I'd move them.

{¶117} "Q. And, so, on the bus you said that he touched your breasts. Did he touch your breasts on the bus? I'm sorry, I just want a clarification.

{¶118} "A. He attempted to. I mean - - "

{¶119} Tr. at 79-80; 81-82; 85-88.

{¶120} Appellant argues the evidence failed to prove the "physical contact" was for sexual arousal or gratification which is necessary to establish "sexual contact". However, there is no requirement there be direct testimony regarding sexual arousal or gratification. *State v. Astley* (1987), 36 Ohio App.3d 247, 523 N.E.2d 322; *State v. Cobb* (1991), 81 Ohio App.3d 179, 610 N.E.2d 1009; *In Re Anderson* (1996), 116 Ohio App.3d 441, 688 N.E.2d 545; *State v. Brady* (July 9, 2001), Stark App. No.2000CA00223, 2001 WL 815574. In the absence of direct testimony regarding sexual arousal or gratification, the trier of fact may infer Appellant was motivated by

desires for sexual arousement or gratification from the "type, nature and circumstances of the contact, along with the personality of the defendant." *State v. Cobb* (1991), 81 Ohio App.3d at 185, 610 N.E.2d 1009; *State v. Brady,* supra (citing *Cobb* ).

**{¶121}** Based upon the testimonial evidence set forth above, Appellant frequently engaged in inappropriate touching of female classmates, often while offering to massage or hug them. We find there is substantial credible evidence from which the trier-of-fact could find all the elements of sexual imposition have been met, and Appellant's adjudication is not against the manifest weight nor sufficiency of the evidence.

**{¶122}** The first assignment of error is overruled.

II.

**{¶123}** In the second assignment of error, Appellant maintains his classification as a Tier I sexual offender is unconstitutional.

**{¶124}** However, in *State v. Cook*, the Ohio Supreme Court determined the sex offender registration statutes are remedial in nature, not criminal and punitive. *State v. Cook* (1998), 83 Ohio St.3d 404.

**{¶125}** In *In re Adrian R.*, this Court cited *Cook*, holding:

**{¶126}** "Moreover, in *State v. Cook* (1998), 83 Ohio St.3d 404, supra, the Ohio Supreme Court found the former version of R.C. 2950 constitutional. Senate Bill 10 amended R.C. 2950 so that classification is no longer based on an individualized analysis. Instead, classification is now based on the type of crime committed. In addition, Senate Bill 10 increased the reporting requirements.

**{¶127}** "In *Cook,* the Ohio Supreme Court determined that the old system effective in 1997 was 'retroactive' because it looked to the prior conviction as a starting point for regulation. *Cook,* 83 Ohio St.3d at 410. Even so, the Court upheld the old system because it had a valid remedial and non-punitive purpose. The *Cook* court determined that Ohio's sex offender statutes did not violate the Ex Post Facto clause of the United States Constitution, finding:

**{¶128}** "R.C. Chapter 2950 serves the solely remedial purpose of protecting the public. Thus, there is no clear proof that R.C. Chapter 2950 is punitive in its effect. We do not deny that the notification requirements may be a detriment to registrants, but the sting of public censure does not convert a remedial statute into a punitive one. *Kurth Ranch,* 511 U.S. at 777, 114 S.Ct. at 1945, 128 L.Ed.2d at 777, fn. 14. Accordingly, we find that the registration and notification provisions of R.C. Chapter 2950 do not violate the Ex Post Facto Clause because its provisions serve the remedial purpose of protecting the public. *Cook,* 83 Ohio St.3d at 423.***

**{¶129}** "***We also find that Senate Bill 10 does not amount to cruel and unusual punishment. In *Cook,* supra, the Supreme Court concluded that sexual offender notification and registration requirements are not punitive in nature; rather, they are remedial measures designed to protect the public. Therefore, such measures do not implicate the protections against cruel and unusual punishment. *Cook,* at 423. See also, *State v. Keibler,* Auglaize App. No. 2-99-51, 2000-Ohio-1666."

**{¶130}** Pursuant to this Court's precedent in *In re Adrian R.*, we overrule Appellant's second assignment of error.

{¶131} The judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed.

By: Hoffman, J.

Gwin, P.J.  and

Edwards, J. concur

s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ W. Scott Gwin_____
HON. W. SCOTT GWIN


s/ Julie A. Edwards_____
HON. JULIE A. EDWARDS

IN THE COURT OF APPEALS FOR LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


IN THE MATTER OF:

J.T.,

DELINQUENT CHILD                         :
                                         :
                                         :
                                         :
                                         :          JUDGMENT ENTRY
                                         :
                                         :
                                         :          Case No. 10-CA-134


       For the reasons set forth stated in our accompanying Opinion, the judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to Appellant.


                                     s/ William B. Hoffman_____
                                     HON. WILLIAM B. HOFFMAN


                                     s/ W. Scott Gwin_____
                                     HON. W. SCOTT GWIN


                                     s/ Julie A. Edwards_____
                                     HON. JULIE A. EDWARDS